**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**STEPHEN L. SNYDER,**<br><br>    **Defendant.** | **Criminal No. DLB 20-337** |

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM
<u>AS TO DEFENDANT STEHPEN L. SNYDER</u>**

The United States of America, by its undersigned counsel, submits this Sentencing Memorandum.

## I.    INTRODUCTION

On November 22, 2024, a jury found Defendant Stephen L. Snyder ("Snyder") guilty of attempted extortion in violation of the Hobbs Act and guilty of seven violations of the Travel Act. ECF No. 299. The jury found that Snyder had attempted to extort the University of Maryland Medical System when he demanded that they pay him $25 million under the guise of a sham consulting agreement. Snyder stated that if he was not paid $25 million, then he would destroy the transplant department at the University of Maryland Medical Center. The defendant's sentencing is scheduled for April 2, 2025. The Government is recommending that the Court sentence Snyder to 36 months of incarceration, followed by three years of supervised release, and also impose a $100,000 fine, and a $100 special assessment for each count.

## II.    SUMMARY OF THE EVIDENCE

### A.  <u>Background</u>

Snyder was an attorney licensed in Maryland who specialized in medical malpractice cases. The University of Maryland Medical System ("UMMS") was a hospital system with hospitals

1

located throughout Maryland.  The University of Maryland Medical Center ("UMMC") was one of the hospitals within UMMS.  UMMC is located in downtown Baltimore and includes a shock trauma unit and transplant department.  The Maryland Medicine Comprehensive Insurance Program ("MMCIP") is the captive insurance program for UMMS.

From in or around January 2018 through September 2018, Snyder threatened to launch a negative publicity campaign falsely accusing UMMS of transplanting diseased organs into unsuspecting and unsophisticated patients, unless UMMS paid him $25 million.  Snyder claimed to have arranged for *The Baltimore Sun* to run a front-page story on his invented scandal, and he threatened to hold a press conference and run internet advertising repeating his false accusations. Snyder produced multiple television commercials that repeated his false claims.  While the extortionate threats arose in the context of potential claims by two clients Snyder represented who had received transplants at UMMS, Snyder repeatedly made clear that the $25 million payment was for him personally, separate and apart from any settlement with his clients.  Snyder demanded that the payment to him be disguised as a sham consulting arrangement.

### B.  January 21, 2018 Settlement Conference

Snyder represented two sets of clients in 2017 and 2018, both of whom suffered an injury following transplants at UMMC.  On January 21, 2018, Snyder and a lawyer representing UMMS, Sue Kinter ("Ms. Kinter"), who was the Senior Vice President for Claims, Litigation, and Risk Management for MMCIP, met for a settlement conference in the first case involving patient Latresce Bennett.  Stephen Bartlett, M.D. ("Dr. Bartlett"), the Chief of Surgery at the University of Maryland Medical Center, attended the conference. During the settlement conference, Snyder asked Dr. Bartlett to step into the hallway for a private conversation. During that conversation, Snyder told Dr. Bartlett that Snyder had another client or clients who wanted to file suit against

2

UMMS over allegations relating to kidney transplants.  Snyder asked Dr. Bartlett for his personal cellular telephone number, which Dr. Bartlett provided to Snyder.

### C.  <u>March 21, 2018 Dinner</u>

On March 21, 2018, Snyder and his fiancée and Dr. Bartlett and his wife met for dinner at the Capital Grille in Baltimore.  When Dr. Bartlett and his spouse arrived, Snyder met with Dr. Bartlett privately at the bar.  The maître d' delivered a file to Snyder.  It contained graphic photographs of Snyder's client, Jeffrey Sanders.  Snyder told Dr. Bartlett that he planned to a make a video that was "really bad."  Snyder repeated several times that he felt "bad" because he and Dr. Bartlett "were friends" and that the transplant program at UMMC would be "destroyed" unless Dr. Bartlett helped Snyder obtain $25 million. Snyder told Dr. Bartlett that he wanted to become an employee of UMMS in order to obtain the $25 million.  Snyder told Dr. Bartlett that if Dr. Bartlett helped him obtain $25 million, Snyder would not use the video but that if Dr. Bartlett did not help him the video "could do a lot of damage" to UMMS and to Dr. Bartlett personally.

Later during dinner, Snyder told Dr. Bartlett's wife, "as long as your husband does what he is supposed to do, he will be okay." Dr. Bartlett tried to redirect the conversation, however, no matter what topic he and his wife tried to introduce, Snyder would return to his warning that "everything would be okay as long as your husband does the right thing."

### D.  <u>April 30, 2018 Meeting</u>

On April 30, 2018, Snyder met with attorneys representing UMMS to discuss the Sanders case.  Snyder submitted a claim on behalf of Michelle Sanders, the widow of Jeffrey Sanders. Jeffrey Sanders was a 60-year-old hemodialysis patient with comorbidities who had a kidney transplant at UMMC, experienced serious complications including amputations, and eventually died.  Snyder and his associate Kevin Stern attended the meeting along with Ms. Kinter, the CEO

of MMCIP DePriest Whye ("Dr. Whye"), and outside counsel for UMMS Natalie Magdeburger ("Ms. Magdeburger"). Ms. Magdeburger took detailed notes of the meeting, and she subsequently wrote a formal memorandum documenting the encounter. *See* Government Exhibit ("G.E.") 110 and 111.[1]  Snyder also prepared written remarks in advance of the meeting. *See* G.E. 113. Those remarks contained the statement, "I'm here to afford an opportunity to this hospital to pay a $25 million premium TO SILENCE MICHELLE and to BURY WHAT MY INVESTIGATION HAS UNCOVERED." *Id.* at 1.

At the meeting, Snyder provided a demand letter seeking $25 million on behalf of Mrs. Sanders. Snyder told the UMMS representatives that the Sanders case created significant reputation issues for UMMS. G.E. 110 at 1. Snyder said that it would take $25 million to silence Snyder about what he had developed in his investigation into UMMS's transplant program. *Id.* Snyder claimed that he liked Dr. Bartlett but that he could do a great deal of damage to his reputation. *Id.* Snyder claimed that UMMS convinced unsophisticated and uneducated patients in need of a transplant into accepting diseased kidneys. *Id.*

Snyder told the UMMS representatives that he had already confirmed that *The Baltimore Sun* would write a front-page article about organ donor fraud. *Id.* at 3. Snyder told the UMMS representatives that he also planned to give a press conference, and that the resulting publicity would be devastating for the hospital. *Id.*

Snyder then played a commercial he had prepared and intended to air if his demands were not met. *Id.* It stated that UMMS did not tell patients that the organs UMMS transplanted were bad organs or that UMMS accepted organs that other institutions rejected. *Id.* The commercial

---

[1] The Government is not re-supplying the trial evidence with this filing as they are already part of the record, and most of these exhibits were also supplied with the Government's Opposition to the Defendant's New Trial Motion.

said that Jeffrey Sanders was told by the surgeon that transplanted his kidney that the surgeon would have transplanted the same organ into his wife but wasn't told that 250 institutions had rejected the same kidney. *Id.* The video showed images of Jeffrey Sanders with necrotic fingertips and an amputated leg. *Id.*

Snyder told the UMMS representatives that he would launch advertisements for his firm directed at transplant recipients if a deal was not struck and that he would attach an "Internet bomb" to anyone looking at UMMS's transplant site which would cause an ad for Snyder's law firm to come up on the viewer's Internet stream if the viewer looked at UMMS's site. *Id.*

Although Snyder did not reference a consulting agreement during this meeting, Ms. Magdeburger's notes stated that Snyder told the UMMS representatives that the $25 million payment was not only a settlement of the Sanders case, but was also part of a "deal" that would conflict him out of future cases and ensure confidentiality. *Id.* Dr. Whye similarly testified that there was a separate "deal" for confidentiality that was raised at the April meeting.

### E.  Kidney Donor Profile Index

The Kidney Donor Profile Index, or KDPI, is one measure of the expected performance of a kidney. Kidneys with a lower KDPI are expected to have a longer life-expectancy than kidneys with a higher KDPI. The KDPI of the kidney that was transplanted into Jeffrey Sanders was 97 out of a possible 100. The trial evidence showed that the usage of high KDPI-kidneys is an accepted practice in the transplantation field, as kidneys with high KDPI's can enhance the life expectancy and quality of life of older patients on dialysis.

### F.  June 22, 2018 Meeting

On June 22, 2018, Snyder again met with representatives of UMMS, including Ms. Kinter, Ms. Magdeburger, and Alicia Reynolds ("Reynolds"), the Director of Claims and Litigation at

MMCIP.  Ms. Reynolds and Ms. Magdeburger took detailed notes of the meeting.  *See* G.E.120, 123, and 145.  Snyder began by stating that he had found new information which made him want to increase his demand to $50 million.  G.E. 123 at 1.  Snyder asked the UMMS representatives whether they were aware of the "Baylor case" referring to Baylor St. Luke's Medical Center, a hospital affiliated with the Baylor College of Medicine, and the effects the allegations made against their transplant program had on Baylor.  G.E. 120 at 1.  Snyder told the UMMS representatives that Baylor almost went out of business.  *Id.*  Snyder also told Kinter that she would lose her job if Snyder went forward with his allegations against the transplant program.  *Id.* at 2.

Snyder said that UMMS would have to enter into an agreement with him separate from the Sanders case.  *Id.*  Specifically, Snyder told the UMMS representatives that he wanted to enter into a consulting agreement with UMMS so that Snyder would be "conflicted out" of any future case. *Id.*  Snyder told the UMMS representatives that they should settle the Sanders case for whatever that case was worth and then pay Snyder $25 million to act as a consultant.  *Id.*  Ms. Kinter told Snyder that she thought the $25 million was the demand for the Sanders case.  *Id.*  Snyder said that Mrs. Sanders does not "deserve" that much money for her case. Snyder stated that the $25 million was for him.  *Id.*

Snyder's associate, Kevin Stern ("Mr. Stern"), testified that the June 22nd meeting was the first time he had heard of the proposed consulting agreement.

Snyder told the UMMS representatives that Dr. Bartlett was in a "shit load" of trouble and that Snyder did not want to hurt him.  G.E. 120 at 3.  Ms. Kinter told Snyder that his comments were making her very uncomfortable and that she felt like she was being threatened.  *Id.*  Ms. Kinter told Snyder that it sounded like he wanted to destroy the UMMS transplant program.  *Id.* Snyder responded that he did not want to destroy the program but that if UMMS called his bluff,

he would do what he needed to do because he was a plaintiffs' lawyer and that is what he does. *Id.* Snyder also wrote prepared remarks for the June meeting that contained the threat, "I like Bartlett. I like you. I don't want to hurt him, and I don't want to hurt the hospital." G.E.117 at 5.

Snyder asked Mr. Stern, who was with him at the meeting, to play a new video Snyder had prepared and that Snyder said he would distribute if UMMS did not pay Snyder $25 million. G.E. 120 at 3. Snyder said he was the "king of taking crazy statements people say and twisting them around" and that the video had statements in it made by members of the transplant department. *Id.*

Ms. Kinter asked Snyder why he wanted $25 million, and Snyder said, "because that is what you have to pay me" and that it could have been "$100 million." *Id.* at 4. Ms. Magdeburger asked Snyder what he thought he could do to earn a $25 million consulting fee. Snyder responded, "I could be the janitor." *Id.* Snyder said it would be a tragedy if UMMS did not pay. G.E. 123 at 7. Snyder said that Ms. Kinter would get fired and the hospital would say "how the fuck did you let this happen" and told the UMMS representatives that they were playing with fire with his client. *Id.* Ms. Reynolds further wrote that Snyder stated, "I don't want to do it so don't make me do it b/c that means its not a threat b/c I don't want to do it." *Id.* at 8.

Snyder then played the video. It started with the words, in red, "PUBLIC SERVICE ANNOUNCEMENT" as well as an alert sound. G.E. 120 at 4. It then showed a text message that Dr. Bartlett had sent Snyder on April 10, 2018, that read: "Sue and I just spoke. She understands on hook for fraud and punitive damages. Ball is in your court."[2] *Id.* The video then showed pictures of several doctors which the video claimed had left UMMS or had been demoted and were

---

[2] Dr. Bartlett testified that he told Ms. Kinter that UMMS was on the hook for fraud and punitive damages because Snyder told him to tell her that. Dr. Bartlett, a physician, did not make his own assessment about the hospital's potential liability.

no longer performing surgery. *Id.* Dr. Bartlett was pictured with the words: "DEMOTED NO LONGER DOING SURGERY – relegated to executive work." *Id.*

Snyder told the UMMS representatives that if they said no to his demand for a $25 million payment separate from any payment to Mrs. Sanders then he would hold a press conference, get an article placed on the front page of *The Baltimore Sun*, solicit interest in national articles, distribute commercials and launch a campaign on Google and Facebook, as well as advertise on the Internet. *Id.* at 4-5.

Snyder's associate, Mr. Stern, also took notes during the meeting. Mr. Stern testified that, at some point after the June meeting, Snyder asked Mr. Stern if he took notes of the June meeting.[3] *See* G.E. 122. Mr. Stern showed Snyder his notes on his laptop. Snyder read the notes and told Mr. Stern to delete them. Mr. Stern refused to delete them, and instead, saved additional copies of his notes in multiple places. Mr. Stern's notes confirmed the notes and recollections of the other attendees, including that the $25 million payment was separate from the Sanders claim, and that Ms. Kinter stated that she felt like she was being threatened. *Id.*

## G. August 23, 2018 Meeting

On August 23, 2018, Snyder and Mr. Stern met with UMMS representatives including Ms. Kinter, Ms. Reynolds, Ms. Magdeburger, and Dr. Whye. During the meeting, Snyder continued his threats against the hospital and Ms. Kinter, personally. Snyder continued to acknowledge that the consulting agreement was a sham, stating that he did not care if he did any work for the hospital at all.

---

[3] During trial, and following the Court's instruction, Mr. Stern testified that this incident arose from an "investigation" but did not specifically reference the Attorney Grievance Commission investigation.

The meeting was video and audio recorded by the FBI. Numerous clips from the August meeting were played for the jury at trial in which Snyder threatened the hospital, threatened Ms. Kinter's job, referenced scandals at other hospitals, demanded payment of $25 million to Snyder, and described the purported consulting agreement as an agreement on paper. Snyder also demanded to present his proposal directly to the UMMS board of directors.

The UMMS witnesses including Ms. Kinter, Dr. Whye, Ms. Magdeburger, and Ms. Reynolds described their genuine fear of what would happen to UMMS if Snyder proceeded with his plans. Ms. Kinter expressed apprehension over losing her job of more than twenty years. Dr. Bartlett and his spouse described their discomfort meeting with Snyder at the Capital Grille and that Snyder was unhinged.

### H.  Snyder's purported reliance on medical experts.

Snyder retained two experts while representing Mrs. Sanders; an epidemiologist, Jesse Schold, Ph.D., and a transplant surgeon, Antonio DiCarlo, M.D. Both testified at trial. Dr. Schold testified that he advised Snyder about the publicly available outcome data related to the performance of the transplant department at UMMC. Dr. DiCarlo testified that he advised Snyder that he thought the donor kidney was not good fit for Mr. Sanders. Neither expert informed Snyder that UMMS was putting profits over safety or was tricking patients into receiving diseased organs.

### I.  Snyder's purported reliance on counsel.

Snyder hired lawyers from two law firms; he hired Eric Yaffe and John McNutt from Gray, Plant, Mooty and he hired Andrew Graham from Kramon & Graham. None of the lawyers testified that they advised Snyder that he could obtain a $25 million sham consultancy by threatening to destroy the transplant department at UMMC. Mr. Yaffe, for example, wrote in a billing entry that Snyder should "be careful" in any negotiation with the hospital. G.E. 124. Mr. Yaffe testified that

he gave this advice to Snyder because he was concerned that he was committing extortion. John McNutt wrote in an email to Snyder on June 21, 2018, that he should turn over two-thirds of any consulting fees to his client. G.E. 119. Yet, at the meeting with UMMS the next day, Snyder never mentioned that he would turn over any amount of fee to his client.

Mr. Graham testified that he was not aware of any of the details of Snyder's negotiations with the hospital. During trial, the Government played two portions of a recorded call between Mr. Graham and Ms. Magdeburger, which made clear that Mr. Graham had limited insight into Snyder's scheme. G.E. 231 and 232.

## III. SENTENCING GUIDELINES

The Government's computation of the sentencing guidelines is as follows:

| | |
|---|---|
| Base Offense Level, § 2B3.3(a): | 9 |
| Loss Enhancement, § 2B3.3(b)/§ 2B1.1: | 20 |
| Abuse of Position of Trust, § 3B1.3: | 2 |
| Obstruction Enhancement, § 3C1.1: | 2 |
| Zero-Point Offender Adjustment, § 4C1.1: | -2 |
| Offense Level: | 31 (108-135 months) |

Here, the Defendant abused a position of public trust and used a special skill as an attorney in perpetrating his extortion scheme. *See* U.S.S.G. § 3B1.3, comment 4 (describing lawyers as possessing "special education, training, or licensing.") Integral to the Defendant's scheme was his position as a prominent medical malpractice plaintiffs' attorney. The Defendant threatened that his commercials, Internet advertising, and videos on social media disparaging the hospital would bring him numerous transplant clients who would file expensive lawsuits against UMMS. Additionally, Snyder also abused his position as an attorney for Michelle Sanders, exploiting her

loss and legitimate medical malpractice claim, for his greed.  Without the knowledge that Mrs. Sanders provided to Snyder about her husband's care and suffering, Snyder would not have been able to execute his scheme.  Snyder further exploited his client by claiming that he had a "mandate from day one" from his client to obtain the consultancy.  The trial testimony proved that there was no such "mandate."

The Defendant also attempted to obstruct or impede an investigation by demanding that Mr. Stern, delete his notes of the meeting on June 22, 2018.  Mr. Stern explained that he took copious notes as Mr. Snyder's associate, and that Snyder demanded that Mr. Stern maintain thorough documentation of their meetings.  In his notes from the June meeting, Stern documented Snyder's demand for $25 million for himself, Snyder's threats against Ms. Kinter, Dr. Bartlett, and the hospital, and Ms. Kinter's statement that she felt very uncomfortable and that she was being threatened.  This conduct falls within U.S.S.G. § 3C1.1, comment 4, subsection (D), namely "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding . . . ."

## IV.    THE PRE-SENTENCE INVESTIGATION REPORT

Snyder, through counsel, provided a purported factual statement, which appears in the Pre-Sentence Investigation Report in paragraphs 33 through 42.  The Government moves to strike these paragraphs from the report, because they are inaccurate and misrepresent the evidence admitted at trial.  As the Court is aware, the appellate court will review the factual recitation contained in the Pre-Sentence Investigation Report as an accurate summary of the evidence admitted at trial, and the PSR will otherwise become part of the record to be used by the Bureau of Prisons or any other court who may review the record.  The Government has noted its objections with the Investigation

Specialist and Supervisory U.S. Probation Officer.  The Government describes its objections to each paragraph more fully below and respectfully requests that they be stricken.

Paragraph 33:

Paragraph 33 provides an introduction regarding Mr. Snyder and Mrs. Sanders' lawsuit.  It is not objectionable, although it repeats information provided in paragraphs 6 and 11 of the Government's factual recitation.

Paragraph 34:

With respect to paragraph 34, the government objects to the reference to Jonathan Schraub, Esquire, as retained by Snyder in "performing his due diligence" in Mrs. Sanders' medical malpractice case.  In fact, Mr. Snyder's previous counsel retained Mr. Schraub as a defense expert in the criminal case.  Mr. Snyder did not consult or retain Mr. Schraub in developing Mrs. Sanders' case.  The government further objects to the characterization that Dr. DiCarlo, a transplant surgeon engaged by Snyder in Mrs. Sanders' case, testified as to the "overall operations of the UMMS kidney transplant program."  At trial, Dr. DiCarlo expressly disavowed any global review or assessment of the UMMC transplant department.  Instead, Dr. DiCarlo limited his opinion to the specific transplant received by Mr. Sanders.  Further, attorney Mr. Schraub relied upon the expert witness designations for Dr. DiCarlo and Dr. Jesse Schold, to offer his opinion that the proposed consulting agreement would give a genuine benefit to UMMS.  The expert designations upon which Mr. Schraub relied were not prepared by Dr. DiCarlo or Dr. Schold, and instead were prepared by Mr. Snyder's previous counsel in the criminal case.  The designations do not accurately reflect the opinions that Dr. DiCarlo and Dr. Schold expressed at trial.  As explained above, Dr. DiCarlo testified that the kidney that was selected was not a good match for Mr. Sanders, not that the transplant program was operating poorly or putting profits over safety, as

Snyder claimed.  Dr. Schold explained that KDPI scores may have the unintended result of dissuading patients on dialysis from receiving transplants.  Both Dr. DiCarlo and Dr. Schold admitted that length of time on dialysis increases risk of death and that the use of high KDPI kidneys, as here, is generally accepted for older, sicker patients.

Paragraph 35:

Regarding paragraph 35, this paragraph improperly discusses the U.S. Attorney's Office's initial decision to decline to prosecute Snyder in 2018, evidence of which was excluded at trial and should not be included in the factual recitation in the Pre-Sentence Investigation Report.  Snyder blurted out this information in his closing argument despite repeated admonitions by the Court not to do so.  This information regarding the initial declination should not be included in the factual statement.  Further, paragraph 35 also omits the trial testimony of Mr. Graham, Mr. McNutt, and Mr. Yaffe that Snyder did not share critical information with them, including his threats to UMMS that he would destroy the hospital if UMMS failed to pay him $25 million.  Mr. Yaffe testified that he was concerned that Snyder might be attempting to extort UMMS when explaining the rationale for his detailed billing entry.  G.E. 124.

Paragraph 36:

Paragraph 36 concerns recordings by investigations of discussions and meetings involving Snyder in furtherance of the extortion scheme.  The sentencing beginning, "It is clear from the content of all these interactions" is a legal conclusion not supported by any evidence adduced at trial.  Rather, Snyder argued to the jury that it was clear from his interactions that he meant to abandon his proposal if it were "not possible to do so ethically and/or legally."  The jury rejected this argument.  Further, paragraph 36 states that "the United States Attorney's Office had advised UMMS to make sure Mr. Graham was not present at any meetings because that office did not want

to have Mr. Graham's voice recorded." This is also inaccurate, and the Government and Snyder played recordings of phone discussions between Ms. Magdeburger and Mr. Graham which were admitted in evidence.

Paragraph 37:

Paragraph 37 is a bald assertion that Snyder did not harbor the requisite intent needed to commit attempted extortion or a violation of the Travel Act. This assertion should not be included in the factual statement of the Pre-Sentence Investigation Report.

Paragraph 38:

This paragraph misstates Mrs. Sanders' trial testimony. Mrs. Sanders explained at trial that she had discussed with Snyder the possibility of his becoming a consultant for UMMS, but that Mrs. Sanders never wanted him to be "on their side" and unable to take cases against UMMS on behalf of people like her. Mrs. Sanders' trial testimony made clear that she did not understand what Snyder was proposing when he suggested that he become a consultant for UMMS. Snyder's own witnesses, including Mr. Schraub and Mr. Graham, explained that as a consultant for UMMS, Snyder would be precluded from filing any lawsuits against the hospital.

Paragraph 39:

Paragraph 39 also misrepresents the evidence adduced at trial. The trial evidence showed that Snyder did not offer to do anything as a consultant. Snyder told Ms. Kinter that they could talk occasionally on the phone or have lunch together, or that he could be the janitor, so long as UMMS paid Snyder $25 million. Snyder made statements like, "You know, you'll call me once a month, or you'll have lunch with me once a month, and you'll get advice from me." and "I don't care if I do anything." G.E. 230, 216.

14

Paragraph 40:

This paragraph asserts that Snyder was entitled to a fee for his representation of Mrs. Sanders. The Government presented evidence at trial that Snyder did receive a fee in connection with the settlement of the Sanders case. Mr. Stern testified that Snyder received a contingency fee based on Mrs. Sanders' $8 million settlement with UMMS. Numerous witnesses, including Ms. Kinter, Ms. Reynolds, Mr. Stern, Ms. Magdeburger, and Dr. Whye explained that the $25 million payment that Snyder demanded was separate from any fee for his client. The $25 million payment was to prevent Snyder from launching a negative publicity campaign that Snyder promised would destroy the hospital and cause Ms. Kinter to lose her job. The Defendant's explanation of Snyder's entitlement to a fee for legal services misrepresents the trial evidence. *See* G.E. 215.

Paragraph 41:

This paragraph is also inaccurate. Snyder stated during the August meeting that he "might" allow UMMS to pay him over a ten-year period, and followed up to the effect that maybe he should not have been so generous in offering the opportunity to pay over time. Snyder also asserts in Paragraph 41 that the "value of the intended services received by UMMS was equal to the intended annual $2.5 million payments that Mr. Snyder would receive." The only witness who testified that UMMS would receive something of value from the sham consultancy was attorney Mr. Schraub. The verdict in this case demonstrates that the jury did not credit Mr. Schraub's opinion.

Paragraph 42:

Paragraph 42 provides a summary of the misleading assertions set forth above and concludes that despite his "valid defenses," the jury convicted Snyder. The only accurate sentence in the paragraph is that "the Jury convicted Mr. Snyder on all counts."

15

For all of these reasons, paragraphs 33 through 42, submitted on behalf of the Defendant, should be excised from the Pre-Sentence Investigation Report.

## V.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The Court's sentence must be "sufficient, but not greater than necessary" to achieve the purposes of sentencing. The Court is further to consider the factors listed in 18 U.S.C. § 3553(a), some of which are discussed below.  Further, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which [the Court] may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

### A. 18 U.S.C. § 3553(a)(1) - the nature and circumstances of the offense and the history and characteristics of the defendant.

Snyder engaged in a meticulously planned, months-long effort to extort $25 million from UMMS.  He hired a media company to create videos that spliced together actual clips from the UMMS transplant website with his own footage.  He scripted his encounters with UMMS.  He separated Dr. Bartlett from the UMMS attorneys, and then he attempted to use Dr. Bartlett's text messages against UMMS. During the August meeting, he separated Sue Kinter from Natalie Magdeburger because he perceived Ms. Kinter as being weaker.  He pressed UMMS to make a decision quickly, because he did not want to give them time to think about his demand.  He did not tell his own associate, Mr. Stern about his plan.  Mr. Stern did not hear about the consultancy until he was at the June meeting.  Snyder hired attorneys to give him a superficial level of legal cover.  The video of the August meeting showed that Snyder, at times, resorted to raw intimidation while, at other times, he attempted to be friendly.  At some level, Snyder's conduct consisted of the type of planning and strategy that one might expect of an experienced attorney who is

16

representing a client in good faith.  Except here, Snyder used all of these tactics to fulfill his desire for power and greed.

Snyder also exploited the loss and suffering of his client.  Through his representation of Mr. and Mrs. Sanders, Snyder learned the details of Mr. Sanders' poor outcome and prolonged suffering.  Their loss only served to fuel Snyder's campaign to enrich himself.  At his trial, Snyder continued to exploit his client by claiming that the consultancy was Mrs. Sanders' idea.  Mrs. Sanders testified that she never wanted Snyder to work for the "other side," showing that she never fully understood Snyder's purported consultancy.

The ramifications of Snyder's scheme would have been catastrophic.  Several witnesses, including Dr. Bartlett, Dr. Barth, Dr. Schold, and Dr. DiCarlo testified that the use of high-KDPI kidneys for dialysis patients was generally accepted medical practice.  Snyder's media campaign would have resulted in fewer patients electing to have transplants, which likely would have caused more people to suffer and die on the waiting list.  Even without his threatened media campaign, his threats have caused institutional harm to UMMS.  UMMS will be supplying a victim impact statement that discusses specific instances of harm to the institution that have occurred as a result of Snyder's threats.

Snyder's conduct also had a personal consequence.  He put Ms. Kinter in fear of losing her job for UMMS, where she had worked for 20 years.  The victim-impact letter will further detail the harm caused by Snyder, not just during his scheme in 2018, but through the bar counsel investigation and the current trial.

Finally, Snyder's malfeasance did not end with the charges in this case.  Snyder represented himself and his trial strategy consisted of the same types of intimidation that he used to commit the underlying offense.  After disregarding numerous court orders, openly mocking government

17

trial witnesses, and disrespecting the entire criminal justice process, the Court held Snyder in contempt.

As for the history and characteristics of the defendant, Snyder was a prominent and successful attorney in the Baltimore area for decades. Yet, he used his prominence as a platform to make his threats against the hospital more devastating. UMMS was aware of Snyder's stature in the community and was aware of his power "take things people say and twist them around."

The defendant was also wealthy. Snyder did not need to commit extortion to pay debts. The evidence at trial showed that Snyder had a successful and lucrative career. He had large homes and drove luxury cars. Snyder committed extortion out of greed and in support of his need for power and control. His sentence should reflect the callous and brazen nature of his conduct.

The defendant will likely point to his age and health as a reason for a lesser sentence. Snyder's PSR does not list any medical conditions that are grave or that cannot be managed by the Bureau of Prisons. Additionally, the compassion release provisions of the First Step Act provide all defendants with the opportunity to seek a re-sentencing if their medical history changes.

### B. 18 U.S.C. § 3553(a)(2)(A) – the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.

Snyder's crimes threatened the reputation of a health care institution that provides life-saving transplants. The Court's sentence should reflect the gravity of Snyder's conduct. In addition to the substantive crimes that he committed, Snyder's conduct during trial demonstrated disrespect and hostility towards the criminal justice process. He treated the witnesses and the Court with disrespect. He attacked and mocked witnesses, and he ignored orders from the Court. The Court should impose a significant sentence that promotes respect for the law.

### C.  18 U.S.C. § 3553(a)(2)(B) - the need to deter criminal conduct

As discussed in the following section, Snyder was not the only attorney to exploit a client's litigation for his own personal advantage.  The Court's sentence should send a deterrent message to attorneys who seek to exploit their client relationships and abuse their license for their own personal gain. Such conduct cannot be countenanced and attorneys who abuse their position should face serious punishment in federal court.

### D.  18 U.S.C. § 3553(a)(6) - the need to avoid unwanted sentencing disparities

In recent years, three attorneys have been prosecuted in two cases involving facts similar to this case.  In *United States v. Avenatti*, 81 F.4th 171, 175 (2023), attorney Michael Avenatti claimed that he obtained damaging information about Nike from a client, but that he would not publish the information if Nike paid him $25 million to perform an internal investigation at Nike. *Id.*  A jury convicted Avenatti of attempted Hobbs Act extortion, among other charges.  Similar to the facts here, the trial evidence showed that Avenatti never intended to perform an internal investigation.  *Id.* at 189 ("There Was No Intent To Conduct a *Bona Fide* Investigation").  The district court sentenced Avenatti to 30 months of imprisonment.  *Id.* at 175.  The circumstances of this case are more egregious, and require a more substantial sentence than in *Avenatti*, because Snyder's threats involved the delivery of lifesaving medical care to particularly vulnerable patients.  As detailed in UMMS' victim-impact statement, Snyder's threats have adversely impacted the transplant department at UMMC.  As detailed at trial, if Snyder had followed through with his threats, then the results would have been catastrophic and far worse than any harm that would have been caused to Nike.

Two attorneys pleaded guilty in the United States District Court for the Western District of Virginia for similar conduct.  In *United States v. Litzenburg*, (3:30-cr-00013, WDVA), attorneys

Timothy Litzenburg and Daniel Kincheloe pleaded guilty to an extortion scheme arising out of their threats to publicize negative information about the victim company unless the company paid them $200 million. Litzenburg received a 24-month sentence and Kincheloe received a 12-month sentence. *See* https://www.justice.gov/archives/opa/pr/virginia-attorneys-sentenced-attempting-extort-multinational-chemicals-company.

The Government is recommending 36-months of incarceration, which is sufficient, but not greater than necessary, to satisfy the purposes set forth in 18 U.S.C. § 3553(a).

## VI.    CONCLUSION

For these reasons, the Government respectfully recommends that the Court sentence Snyder to 36 months of incarceration, followed by three years of supervised release, and also impose a $100,000 fine, and a special assessment of $800.

> Respectfully submitted,
>
> Kelly O. Hayes
> United States Attorney
>
> _____/s/_____
> Matthew P. Phelps
> Evelyn L. Cusson
> Assistant United States Attorneys